# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| ABDUL HOWARD, | Case No.: 2:15-cv-01458-APG-VCF |
| Plaintiff | **Order Denying in Part Defendant's Motion for Summary Judgment** |
| v. | [ECF No. 107] |
| BONNIE POLLEY, et al., | |
| Defendants | |

    Plaintiff Abdul Howard filed this lawsuit under 42 U.S.C. § 1983 against Bonnie Polley and several other defendants, alleging they violated his First, Eighth, and Fourteenth Amendment rights while he was incarcerated at the Clark County Detention Center (CCDC). After screening, his First and Fourteenth Amendment claims were allowed to proceed against Polley, along with another claim against former defendant Peggy Martinez. The claims against Martinez have been dismissed, leaving Howard's claims against Polley as the only remaining claims in the case. Polley moved for summary judgment, arguing that there was no constitutional violation and that, even if there were, she did not personally participate in it, and she is entitled to qualified immunity. I deny the motion and order the parties to submit further briefing on the issue of qualified immunity.

## Background

    When inmates arrive at CCDC, they are screened to determine the safest module in which to house each person.[1] Christian religious services are offered in each housing module, allowing Christian inmates to attend services freely.[2] Muslim Jumu'ah services, however, are run as a

---

[1] ECF No. 109 at 3.
[2] ECF No. 108-8 at 4.

"program" offered in one location for inmates from all housing modules to attend.[3]  To participate in Jumu'ah services, Muslim inmates at CCDC must submit a request and wait to be screened, which sometimes takes several weeks.[4]  Christian and Jewish inmates are allowed to participate in religious services without having to make a request and wait for screening.[5]

Howard, a Muslim inmate at CCDC, sues Polley, who is CCDC's religious coordinator and chaplain.[6]  He alleges that the way CCDC runs Jumu'ah services violates his First Amendment right to free exercise by denying him access to religious services.  He further alleges that the program violates the Fourteenth Amendment's Equal Protection Clause because similarly-situated Christian and Jewish inmates do not have to wait to attend religious services.[7]  Polley moves for summary judgment on both of these claims, arguing that the program does not violate Howard's rights and that, even if it did, she did not personally participate in the violation and she is entitled to qualified immunity.[8]

**Discussion**

**A.     Summary Judgment Standard**

Summary judgment is appropriate when the pleadings and admissible evidence "show there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[9]  When considering summary judgment, the court views all facts and draws all

---

[3] *Id.* at 5.
[4] ECF No. 107-1 at ¶ 9.
[5] ECF No. 108-8 at 4.
[6] ECF No. 7 at 3.
[7] ECF No. 7 at 5–7.
[8] ECF No. 107.
[9] *See Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986) (citing Fed. R. Civ. P. 56 (c)).

2

inferences in the light most favorable to the nonmoving party.[10] If reasonable minds could differ on material facts, summary judgment is inappropriate because its purpose is to avoid unnecessary trial when the facts are undisputed, and the case must then proceed to the trier of fact.[11]

If the moving party satisfies its burden by demonstrating the absence of any genuine issue of material fact, the burden shifts to the party resisting summary judgment to "set forth specific facts showing that there is a genuine issue for trial."[12] The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts"; he "must produce specific evidence, through affidavits or admissible discovery material, to show that" there is a sufficient evidentiary basis on which a reasonable fact finder could find in his favor.[13]

**B.   First Amendment Free Exercise**

Prisoners retain their First Amendment rights, including the right to free exercise of religion.[14] But limitations on a prisoner's free-exercise rights arise both from the fact of incarceration and from valid penological objectives.[15] Prison regulations alleged to infringe on the religious-exercise right must be evaluated under the "reasonableness" test set forth in *Turner*

---

[10] *Kaiser Cement Corp. v. Fishbach & Moore, Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986).

[11] *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995); *see also Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994).

[12] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Celotex*, 477 U.S. at 323.

[13] *Bank of Am. v. Orr*, 285 F.3d 764, 783 (9th Cir. 2002) (internal citations omitted); *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991); *Anderson*, 477 U.S. at 248–49.

[14] *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987).

[15] *Id.*; *McElyea v. Babbitt*, 833 F.2d 196, 197 (9th Cir. 1987); *Hartmann v. Cal. Dep't of Corr. & Rehab.*, 707 F.3d 1114, 1122 (9th Cir. 2013) (Prisoners' rights under the Free Exercise Clause are limited by "institutional objectives and the loss of freedom concomitant with incarceration").

*v. Safley*.¹⁶ *Turner* set forth four factors to determine whether a prison regulation is reasonable: (1) there must be a valid, rational connection between the prison regulation and the legitimate government interest put forward to justify it; (2) whether alternative means of exercising the right on which the regulation impinges remain open to inmates; (3) the impact that accommodation of the asserted right will have on guards, other inmates, and the allocation of prison resources; and (4) the absence of ready alternatives.¹⁷

Polley argues that the interest at issue here is institutional security.¹⁸ She notes that CCDC is a temporary housing facility with a "transient" inmate population.¹⁹ Because there is a "low number" of Muslim inmates and limited Imams available to preside over Jumu'ah services, CCDC cannot hold services in each individual housing module like it does for Christian services.²⁰ Because the weekly Jumu'ah service is centralized, inmates from any of CCDC's housing modules may attend, so CCDC has to screen the requests to attend the service to prevent security issues that may arise if inmates housed separately come into contact at the service.²¹ Howard acquiesces to this logic in his deposition testimony. He understands why CCDC staff monitors the program for safety and security and that it is important to do so.²² But Howard has

---

¹⁶ *Turner v. Safley*, 482 U.S. 78, 89–91 (1987); *O'Lone*, 482 U.S. at 349; *Freeman v. Arpaio*, 125 F.3d 732, 736 (9th Cir. 1997), *overruled on other grounds as recognized by Penwill v. Holtgeerts*, 386 F. App'x 665, 667 (9th Cir. 2010).

¹⁷ *Allen v. Toombs*, 827 F.2d 563, 567 (9th Cir. 1987) (citing *Turner*, 482 U.S. at 89–91).

¹⁸ ECF No. 107 at 4.

¹⁹ *Id.*

²⁰ *Id.*

²¹ *Id.*

²² ECF No. 107-4 at 13, 15.

not abandoned his Free Exercise claim. Instead, he focuses on the consequence of the policy: the delay between an inmate's request to attend services and receiving permission to attend.[23]

Howard argues there are questions of fact regarding (1) whether limiting access to Jumu'ah services is related to the interest in security,[24] (2) what, if any, impact an accommodation would make on prison operations,[25] and (3) potential alternatives to achieve CCDC's interest.[26] Specifically, questions exist about the number of Muslim inmates and available Imams,[27] which leaves open questions about alternatives available to CCDC, whether multiple services could be made available, and whether inmates could be asked in their initial screening whether they planned to attend Jumu'ah services.

In reply, Polley asserts that allowing inmates to attend services without additional screening is unsafe and unreasonable.[28] She contends that the information from the initial intake screening is "useless" in determining whether an inmate will pose a potential threat at the centralized Jumu'ah services.[29] However, Polley does not state what information is included in the intake screening and how the initial screening differs from the screening after the request is made. Polley also fails to respond to Howard's suggestion that CCDC could hold multiple Jumu'ah services utilizing multiple volunteer Imams.

---

[23] ECF No. 108 at 4 n.1.
[24] *Id.* at 4–5.
[25] *Id.* at 6–7.
[26] *Id.* at 7–8.
[27] *Id.* at 4 (citing ECF No. 107-4 at 15, 108-4 at 4, 108-5 at 6).
[28] ECF No. 109 at 4.
[29] *Id.* at 7.

Polley has not satisfied her burden of showing an absence of questions of fact related to Howard's free exercise claim. She has not shown that there are not enough Imams available to run multiple Jumu'ah services,[30] nor has she shown that it is impractical to ask inmates on intake about attending Jumu'ah services. Polley asserts that the Muslim inmate population is too low to hold multiple services but does not provide numbers to support that assertion. But determining the reasonableness of the program requires a comparison between the Muslim and Christian inmate populations and between the number of available leaders for the religious services. These questions are relevant to the *Turner* factors. Accordingly, I deny summary judgment on this claim.

C.  **Fourteenth Amendment Equal Protection**

"Prisoners enjoy religious freedom and equal protection of the law subject to restrictions and limitations necessitated by legitimate penological interests."[31] "[P]rison officials cannot discriminate against particular religions," and "must afford an inmate of a minority religion 'a reasonable opportunity of pursuing his faith comparable to the opportunity afforded fellow prisoners who adhere to conventional religious precepts.'"[32] This does not require identical facilities or personnel;[33] rather, prisons "must make good faith accommodation of the prisoners' rights in light of practical considerations."[34]

---

[30] Neither party affirmatively shows the number of available Imams. Polley does not offer a number (asserting only that the number is "limited"), while Howard attests to knowing of five available Imams. ECF Nos. 107 at 4, 108-1 at ¶ 2.

[31] *Freeman*, 125 F.3d at 737.

[32] *Id.* (quoting *Cruz v. Beto*, 405 U.S. 319, 322 (1972)).

[33] *Cruz*, 405 U.S. 822 n.2.

[34] *Allen v. Toombs*, 827 F.2d 563, 569 (9th Cir. 1987).

A plaintiff "must show that officials intentionally acted in a discriminatory manner" to prevail on an equal protection claim.[35] Discriminatory intent can sometimes be inferred by the mere fact of different treatment.[36] "To defeat summary judgment, therefore, [a plaintiff] 'must set forth specific facts showing that there is a genuine issue' as to whether he was afforded a reasonable opportunity to pursue his faith as compared to prisoners of other faiths and that such conduct was intentional."[37]

Polley argues that CCDC's policy does not violate the equal protection clause because the policy is necessary to achieve the legitimate interest in institutional security.[38] She gives the same explanation discussed above—that the additional screening is necessary to ensure security at the centralized service with inmates from all housing modules in attendance.[39] Howard responds that there is an issue of material fact about Polley's discriminatory intent.[40] While Polley asserts that there is no policy maker for religious programs, as religious coordinator she is tasked with planning, directing, and supervising all aspects of the institution's religious programs.[41] Howard contends that Polley's excuse that her department does not run the Jumu'ah services or the waiting list is pretext for her discriminatory intent.[42] Howard argues that there are

---

[35] *Freeman*, 125 F.3d at 737.
[36] *Sischo-Nownejad v. Merced Cmty. Coll. Dist.*, 934 F.2d 1104, 1112 (9th Cir. 1991).
[37] *Freeman*, 125 F.3d at 737 (quoting Fed. R. Civ. P. 56 (a)).
[38] ECF No. 107 at 8.
[39] *Id.*
[40] ECF No. 108 at 9.
[41] ECF No. 108-9 at 3.
[42] ECF No. 108 at 10.

facts to support the assertion that Polley was motivated by discriminatory animus and not institutional security in designing the Jumu'ah services program.[43]

Polley has not shown an absence of disputed facts related to this claim. Questions of fact remain regarding the practical considerations upon which Polley relies. Polley asserts that the reason to distinguish between Muslim and Christian inmates is based on the number of Muslim inmates and available Imams to run services. But Polley has not presented evidence as to the number of Imams or Muslim inmates at CCDC. Similarly, Howard contends that there is no reason for the additional screening because inmates are screened for safety issues upon intake and interest in Jumu'ah services could easily be included in that screening. In response, Polley merely asserts that doing so would be "impractical." But she does not identify the difference between the screenings and what would be impractical about adding additional questions during the intake screening process. Accordingly, I deny Polley's motion for summary judgment as to this claim.

**D.      Personal Participation**

A defendant is liable under § 1983 "only upon a showing of personal participation by a defendant."[44] "A supervisor is only liable for constitutional violations of his subordinates if the supervisor participated in or directed the violations, or knew of the violations and failed to prevent them. There is no respondeat superior liability under § 1983."[45] "A person deprives another 'of a constitutional right, within the meaning of section 1983, if he does an affirmative

---

[43] *Id.*

[44] *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).

[45] *Id.*

act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do that *causes* the deprivation of which [the plaintiff complains].'"[46]

Polley argues that Howard has not alleged she personally participated in the alleged violation of Howard's rights.[47] Howard responds that Polley, as the religious coordinator, is responsible for supervising all aspects of the religious programs. He contends that by not responding to his complaints about the waiting period and by developing the plan to have Jumu'ah services run as a "program," Polley personally contributed to the violation of his rights.[48]

Polley has not shown an absence of material fact as to this issue. In her affidavit Polley does not deny personal involvement in the implementation of the Jumu'ah services as a program. A reasonable jury could find that she personally participated in a violation of Howard's rights based on her position at CCDC. Howard has not claimed Polley is liable under respondeat superior, and Polley does not present evidence that she oversees individuals who actually participated in the alleged violation. Polley does not aver that someone else made the decision to run Jumu'ah services as a program. It is unclear from the parties' briefing who is responsible for the program, but Howard has raised a genuine dispute as to whether Polley is responsible. This question of fact precludes summary judgment on this issue.

**D. Qualified Immunity**

To allay the "risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties," government officials performing

---

[46] *Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1991) (emphasis in original) (quoting *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978)).
[47] ECF No. 107 at 9.
[48] ECF No. 108 at 11 n.2.

9

discretionary functions may be entitled to qualified immunity for claims made under § 1983.[49] Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law."[50] In ruling on a qualified immunity defense, I make a two-pronged inquiry into whether (1) the defendant violated the plaintiff's constitutional right and (2) whether that right was clearly established.[51] I may consider these two prongs in any order.[52]

A right is clearly established if "'it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'"[53] I make this inquiry "in light of the specific context of the case, not as a broad general proposition."[54] An officer will be entitled to qualified immunity even if she was mistaken in her belief that her conduct was lawful, so long as that belief was reasonable.[55]

The plaintiff bears the burden of showing that the right at issue was clearly established.[56] But a plaintiff need not establish that a court previously declared the defendant's behavior unconstitutional if it would be clear from prior precedent that the conduct was unlawful.[57] A plaintiff does not have to cite a case that is "directly on point, [but] existing precedent must have

---

[49] *Anderson v. Creighton*, 483 U.S. 635, 638 (1987)
[50] *Malley v. Briggs*, 475 U.S. 335, 341 (1986).
[51] *Sorrels v. McKee*, 290 F.3d 969 (9th Cir. 2002).
[52] *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).
[53] *Wilkins v. City of Oakland*, 350 F.3d 949, 954 (9th Cir. 2003) (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001) (emphasis omitted)).
[54] *Saucier*, 533 U.S. at 200.
[55] *Wilkins*, 350 F.3d at 955.
[56] *Sorrels*, 290 F.3d at 969.
[57] *Blueford v. Prunty*, 108 F.3d 251, 254 (9th Cir. 1997).

placed the . . . constitutional question beyond debate."[58] While there are rare cases where unlawfulness is obvious without case law, typically a body of relevant law is necessary to show a right is clearly established.[59] The United States Supreme Court has cautioned against defining "clearly established law at a high level of generality, [because] doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced."[60]

The parties' briefs have not sufficiently addressed the qualified immunity issue. Neither Howard nor Polley identifies what specific rights are at issue and thus also do not adequately address whether those rights are clearly established. Without argument from the parties clearly and specifically defining the rights at issue for both of Howard's constitutional claims, I cannot decide the qualified-immunity question. Accordingly, I order the parties to submit supplemental briefing on this issue.

For the First Amendment claim, Howard must first define the right at issue. He must go beyond the broad category of constitutional religious rights and identify the specific problem with CCDC's policy (i.e., is it the delay while waiting for screening or is it the fact that Muslim inmates must request screening at all or is it both?). Then, Howard must point to a specific case, body of case law, or other authority that existed before the actions took place that would have put a reasonable officer in Polley's position on notice that her actions would have violated the specifically defined right at issue.

---

[58] *Hamby v. Hammond*, 821 F.3d 1085, 1090 (9th Cir. 2016) (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 740 (2011)).

[59] *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (per curiam).

[60] *Plumhoff v. Rickard*, 572 U.S. 765, 134 S. Ct. 2012, 2023 (2014) (internal quotation marks and citations omitted).

For the equal protection claim, Howard must do the same thing. First, he must define the right at issue, going beyond general statements of constitutional principles (again, is it the fact that Muslims must be screened while Christians are not, is it that Muslims must wait to attend services while Christians do no, is it that Muslims face punishment for not attending services while Christians do not, or some combination of these issues?). Once he has identified the specific right at issue, he must then identify a case, body of case law, or other authority that would have put a reasonable officer on notice that her actions violated that right.

Howard must file his supplemental brief within 30 days of the entry of this order, and Polley must file her response within 30 days of Howard's filing. There will be no further briefing absent an order from me.

**Conclusion**

IT IS THEREFORE ORDERED that defendant Bonnie Polley's motion for summary judgment **(ECF No. 107) is denied in part**.

IT IS FURTHER ORDERED that plaintiff Abdul Howard must file a supplemental brief on the issue of qualified immunity within 30 days of the entry of this order. Polley must file her response to Howard's brief within 30 days thereafter. There will be no further briefing absent court order.

DATED this 6th day of November, 2018.

ANDREW P. GORDON
UNITED STATES DISTRICT JUDGE